[Cite as *Al Neyer, L.L.C. v. Westfield Ins. Co.*, 2020-Ohio-5417.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| AL NEYER, LLC, | : | APPEAL NO. C-200007 |
| | | TRIAL NO. A-190072 |
| Plaintiff-Appellee, | : | |
| vs. | : | *O P I N I O N.* |
| WESTFIELD INSURANCE COMPANY, | : | |
| Defendant-Appellant, | : | |
| and | : | |
| BERKLEY ASSURANCE COMPANY, | : | |
| Defendant-Appellee. | : | |

Civil Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Reversed and Cause Remanded

Date of Judgment Entry on Appeal: November 25, 2020

*Brouse McDowell, Amanda M. Leffler* and *Lucas M. Blower*, for Plaintiff-Appellee,

*Fischer, Evans & Robbins, Ltd.*, and *Cari Fusco Evans*, for Defendant-Appellant,

*Rendigs, Fry, Kiely & Dennis, LLP*, and *John F. McLaughlin*, for Defendant-Appellee.

**ZAYAS, Judge.**

**{¶1}** Defendant-appellant Westfield Insurance Company appeals from a judgment of the Hamilton County Court of Common Pleas granting summary judgment in favor of plaintiff-appellee Al Neyer, LLC, ("Neyer") a construction company. For the following reasons, we reverse.

### I. Background and Procedural History

**{¶2}** This case arises from an interior demolition of a restaurant in Oakdale, Pennsylvania.

**{¶3}** In the months preceding the demolition, the building owner, the King Trust, alleged that its tenant, KRG Kings, LLC, ("KRG") was in breach of a lease agreement that required KRG to maintain a restaurant in the building. The King Trust filed an action for ejectment against KRG in the Western District of Pennsylvania, in the case captioned *King v. KRG Kings, LLC* (the "King Litigation"). *See King v. KRG Kings, LLC*, W.D.Penn. No. 2:18-CV-00223, 2019 WL 626237 (Feb. 14, 2019). KRG operated "Kings Family Restaurant" in the space for a time but had apparently abandoned it. Based upon the abandonment, and with the intention of retaking possession of the property, the King Trust began to explore other options for the space, including leasing the property as a new medical center to Weirton Medical Center ("Weirton").

**{¶4}** Weirton entered into a lease with the King Trust and contacted Neyer, a Cincinnati-based company that designs and constructs commercial real estate, regarding the renovations. Weirton discussed with Neyer the costs and the work to be performed, including demolition of the existing restaurant, but the parties did not formalize an agreement.

{¶5} Despite not having a signed contract with Weirton, and without notifying senior management at Neyer, a project manager for Neyer secured the necessary permits and proceeded with the demolition of the restaurant space.

{¶6} Unbeknownst to the project manager, the King Trust's right to lease the building to Weirton was being disputed by KRG in the King Litigation, as KRG contended that it still had legal possession of the property. Senior management at Neyer knew that an existing tenant had to be released from a lease before Weirton would finalize a contract with Neyer to begin the renovations but did not know of KRG's identity or its specific claims to the property.

{¶7} Upon learning of the demolition, KRG added to its counterclaims against the King Trust claims for aiding and abetting tortious conduct and negligence for allegedly contemplating the demolition of the property. KRG also asserted third-party claims against Weirton and Neyer for trespass, conversion, tortious interference with contractual relations, and negligence. The King Trust and Weirton filed cross-claims against Neyer for contribution and indemnity for demolishing the interior of the property without authorization.

{¶8} Neyer sought coverage for these claims under its commercial general liability insurance policies provided through Westfield Insurance Company ("Westfield") and Berkley Assurance Company ("Berkley"). Westfield agreed to defend Neyer against the claims, but reserved the right to later dispute its obligations to indemnify Neyer for any judgment or settlement.

{¶9} Ultimately, the King Litigation settled. Westfield, however, refused to indemnify Neyer for the amount Neyer paid for the settlement.

{¶10} On January 4, 2019, Neyer sued Westfield and Berkley. Neyer sought a declaration of coverage, as well as damages for Westfield's and Berkley's anticipatory breach of contract for their refusal to indemnify Neyer for all sums that

3

it was obligated to pay as part of the settlement in the King Litigation. Westfield and Berkley filed separate answers. Berkley also filed a cross-claim against Westfield, asserting that Westfield had priority of coverage as the primary insurer of Neyer. At the close of discovery, Westfield filed a motion for summary judgment and Neyer filed a cross-motion for summary judgment. Berkley filed a cross-motion for partial summary judgment.

{¶11} On December 9, 2019, the trial court issued a judgment granting Neyer's cross-motion for summary judgment and Berkley's cross-motion for partial summary judgment and denying Westfield's motion for summary judgment. The trial court found that "although the demolition was volitional, the resulting damage to the property of KRG was not intended or anticipated by anyone at [] Neyer." The trial court reasoned that although senior management at Neyer knew of a lease dispute involving the property, it did not know of the project manager's plans to begin with the demolition; and, while the project manager knew of his own plans for the demolition, he did not know of the lease dispute. Therefore, the trial court held that the demolition of the property "was an accident and the result of an 'occurrence' under the Westfield policy." The trial court rejected Westfield's argument that, because Neyer intended to demolish the property, the property damage was not accidental. The trial court also rejected Westfield's argument that policy exclusions applied to deny coverage. The trial court found that Berkley's coverage was in excess of Westfield's liability limits, and therefore Berkley had no duty to defend or indemnify Neyer.

{¶12} Westfield now appeals, asserting one assignment of error.

## II. Analysis

### A. Standard of Review

{¶13} We review summary-judgment decisions de novo. *See Holloman v. Permanent Gen. Assur. Corp.*, 1st Dist. Hamilton No. C-180692, 2019-Ohio-5077, ¶ 8, citing *Comer v. Risko*, 106 Ohio St.3d 185, 2005-Ohio-4559, 833 N.E.2d 712, ¶ 8. "We accord no deference to the trial court's decision and independently review the record to determine whether summary judgment is appropriate." *Sarrough v. Budzar*, 2015-Ohio-3674, 38 N.E.3d 921, ¶ 15 (8th Dist.).

{¶14} Under Civ.R. 56(C), summary judgment is proper where the moving party establishes that "(1) no genuine issue of any material fact remains, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and construing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made." *State ex rel. Duncan v. Mentor City Council*, 105 Ohio St.3d 372, 2005-Ohio-2163, 826 N.E.2d 832, ¶ 9, citing *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977).

{¶15} The moving party carries an initial burden of informing the court of the basis for the motion and identifying those portions of the record that set forth specific facts that demonstrate its entitlement to summary judgment. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264 (1996). If the moving party fails to meet this burden, summary judgment is not appropriate. If the moving party meets this burden, summary judgment is appropriate only if the nonmoving party fails to meet its reciprocal burden, setting forth specific facts establishing that a genuine issue exists for trial. *Id.* at 293.

## B. Discussion

{¶16}  In its sole assignment of error, Westfield argues that the trial court erred in declaring that Neyer is entitled to coverage for defense and indemnification of the King Lawsuit pursuant to its commercial general liability ("CGL") policy. Westfield argues that the CGL policy it issued to Neyer included coverage for property damage caused by an "occurrence," which means an "accident," and that such an accident did not take place so as to trigger coverage.  We agree.

{¶17}  The terms of Neyer's coverage provide, in relevant part:

SECTION I – COVERAGES

COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. INSURING AGREEMENT

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.  We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result.

* * *

SECTION V – DEFINITIONS

* * *

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

* * *

6

17. "Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

The term "accident" is not defined in the policy.

{¶18} When interpreting an insurance policy, the Ohio Supreme Court has instructed:

When confronted with an issue of contractual interpretation, the role of a court is to give effect to the intent of the parties to the agreement. *Hamilton Ins. Servs., Inc. v. Nationwide Ins. Cos.*, 86 Ohio St.3d 270, 273, 714 N.E.2d 898 (1999), citing *Employers' Liab. Assur. Corp. v. Roehm*, 99 Ohio St. 343, 124 N.E. 223, syllabus (1919); *see also* Section 28, Article II, Ohio Constitution. We examine the insurance contract as a whole and presume that the intent of the parties is reflected in the language used in the policy. *Kelly v. Med. Life Ins. Co.*, 31 Ohio St.3d 130, 509 N.E.2d 411, paragraph one of the syllabus (1987). We look to the plain and ordinary meaning of the language used in the policy unless another meaning is clearly apparent from the contents of the policy. *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 374 N.E.2d 146, paragraph two of the syllabus (1978).

*Westfield Ins. Co. v. Custom Agri Sys.*, 133 Ohio St.3d 476, 2012-Ohio-4712, 979 N.E.2d 269, ¶ 8, quoting *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, ¶ 11.

7

**{¶19}** Westfield argues that Neyer, through its project manager, is responsible for demolishing property without the authority to do so and such an act was within the control of Neyer, and therefore not an "accident" covered by the policy. In support, Westfield cites to two Ohio Supreme Court cases, *Westfield Ins. Co. v. Custom Agri Systems, Inc.*, 133 Ohio St.3d 476, 2012-Ohio-4712, 979 N.E.2d 269, and *Ohio Northern Univ. v. Charles Constr. Servs., Inc.*, 155 Ohio St.3d 197, 2018-Ohio-4057, 120 N.E.3d 762, which hold that when "occurrence" in a commercial general liability insurance policy is defined as an "accident," conduct within the control of an insured resulting in foreseeable damages is not covered.

**{¶20}** In *Custom Agri Systems*, the Supreme Court held that an insurance claim filed by a contractor under its CGL policy for property damage caused by the contractor's own faulty workmanship did not involve an "occurrence" such that the policy would cover the loss. *See Custom Agri Systems* at ¶ 1. In *Ohio Northern Univ.*, the court applied the same holding to an insurance claim for property damage caused by a subcontractor. *See Ohio Northern Univ.* at ¶ 2. Because the CGL policies did not define "accident," the court in both cases looked to the word's common meaning.

**{¶21}** The ordinary meaning of the term "accident" "is an event proceeding from an unexpected happening or unknown cause without design and not in the usual course of things; * * * an undesigned, sudden and unexpected event; an event which proceeds from an unknown cause or is an unusual effect of a known cause and, therefore, unexpected." *JTO, Inc. v. State Auto. Mut. Ins. Co.*, 194 Ohio App.3d 319, 2011-Ohio-1452, 956 N.E.2d 328, ¶ 29 (11th Dist.); *see Custom Agri Systems* at ¶ 13; *Ohio Northern Univ.* at ¶ 17. The court determined that inherent in the meaning of "accident" is the concept of "fortuity." *See Custom Agri Systems* at ¶ 14; *Ohio Northern Univ.* at ¶ 17. Quoting the Eleventh District, the court said:

8

Insurance coverage is bottomed on the concept of fortuity. Applying this rule in the construction context, truly accidental property damage generally is covered because such claims and risks fit within the statistical abstract. Conversely, faulty workmanship claims generally are not covered, except for their consequential damages, because they are not fortuitous. In short, contractors' "business risks" are not covered by insurance, but derivative damages are. The key issues are whether the contractor controlled the process leading to the damages and whether the damages were anticipated.

Coverage analysis largely turns on the damages sought. If the damages are for the insured's own work, there is generally no coverage. If the damages are consequential and derive from the work the insured performed, coverage generally will lie. The underwriting intent is to exclude coverage for the contractor's business risks, but provide coverage for unanticipated consequential damages.

(Internal citations and quotations omitted.) *Custom Agri Systems* at ¶ 13, quoting *JTO, Inc. v. State Auto. Mut. Ins. Co.*, 194 Ohio App.3d 319, 2011-Ohio-1452, 956 N.E.2d 328, ¶ 32-33 (11th Dist.).

{¶22} Thus, a CGL policy may provide coverage for claims arising out of tort and breaches of contract "as long as the requisite accidental occurrence and property damage are present." *ACUITY v. Burd & Smith Const., Inc.*, 2006 ND 187, 721 N.W.2d 33, ¶ 12 (Aug. 24, 2006); *see Custom Agri Systems* at ¶ 10 (citing *ACUITY*). The court held that claims for faulty workmanship, however, were not fortuitous in the context of a CGL policy, reasoning that the claims resulting from defective work "could not be deemed unexpected." *Custom Agri Systems*, 2012-Ohio-4712 at ¶ 16-

17, citing *Essex Ins. Co. v. Holder*, 370 Ark. 465, 261 S.W.3d 456 (2008); *see Ohio Northern Univ.* at ¶ 27.

{¶23} Here, KRG brought claims against Neyer for property damage to its leasehold and to equipment that was at the property during the interior demolition. In the unusual circumstances of this case, the interior demolition of the restaurant was Neyer's desired result and Neyer controlled the process leading to the damages. That is, Neyer was anticipating a contract with Weirton for this specific demolition. Thus, we cannot say these claims are a fortuitous accident.

{¶24} Neyer argues that because the claims were for consequential damages that did not involve faulty workmanship, "the fortuity doctrine" does not apply. Neyer also contends that because damages were ultimately caused to a third party (KRG) and because no one person at Neyer knew that such damages would result, the event can be described as an accident. However, just as faulty workmanship was not fortuitous in *Customs Agri Systems* and *Ohio Northern Univ.*, neither is premature work.

{¶25} Proceeding with a demolition without a formal contract in place was not accidental, it was entirely within the project manager's control. Neyer could have anticipated that premature performance—i.e., performance without a contract in place—could cause damages to a known third party. Such a result was not within "the statistical abstract" of "truly accidental property damage." *See Custom Agri Systems*, 2012-Ohio-4712 at ¶ 13. For instance, the anticipated contract with Weirton could have fallen through for any number of reasons, meaning that Weirton would not have wanted to proceed with the demolition at all, yet Neyer had already demolished the space. Accordingly, Neyer's project manager's action are more aptly described as that "which business management can and should control or manage." *See id.* at ¶ 10. That senior management did not control or manage its risk does not

make the subsequent demolition and damages to KRG an accidental occurrence covered by the Westfield CGL policy.

{¶26}  Therefore, we conclude that the trial court erroneously determined that Neyer's unauthorized demolition of the restaurant constituted an "occurrence" within the meaning of Westfield's CGL policy.  Because we find that Neyer is not entitled to coverage under the policy, we need not reach the issue of whether policy exclusions apply.  Westfield's sole assignment of error is sustained.

### Conclusion

{¶27}  The judgment of the trial court granting summary judgment in favor of Neyer is reversed and the matter is remanded for the trial court to enter summary judgment in favor of Westfield.

Judgment accordingly.

**MOCK, P.J.,** and **WINKLER, J.,** concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.