[Cite as *Camp v. Gerwin*, 2024-Ohio-84.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

|  |  |  |
|---|---|---|
| THOMAS H. CAMP, | : | APPEAL NOS. C-230066 |
|  |  | C-230082 |
| and | : | TRIAL NO. A-2103908 |
| PATRICIA E. CAMP, | : |  |
| Plaintiffs-Appellees/Cross-Appellants, | : | *O P I N I O N.* |
|  | : |  |
| vs. | : |  |
|  | : |  |
| ROBERT F. GERWIN, II, | : |  |
| and | : |  |
| CAMP SAFETY EQUIPMENT, INC., | : |  |
| Defendants-Appellants/Cross-Appellees. | : |  |

Civil Appeals From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: January 12, 2024

*Flagel & Papakirk LLC*, *James Papakirk*, *Hallie Schneider Borellis* and *Zachary P. Elliot*, for Plaintiffs-Appellees/Cross-Appellants,

*Strauss Troy Co., LPA*, and *Alex S. Rodger*, for Defendants-Appellants/Cross-Appellees.

**BERGERON, Judge.**

{¶1} After the sale of a small business in 2016, financial difficulties besieged the company, leading to the renegotiation of several agreements and ultimately contentious litigation as both buyer and seller sought to assign blame. Plaintiffs-appellees/cross-appellants Thomas and Patricia Camp ("the Camps") sold their safety equipment business, defendant-appellant/cross-appellee Camp Safety Equipment ("CSE"), to defendant-appellant/cross-appellee Robert H. Gerwin. Following the failure of CSE and Mr. Gerwin (collectively, "Defendants") to meet their payment obligations, Mr. Camp sued for breach of contract. Mr. Gerwin countersued, accusing the Camps of breaching the initial contract and committing fraud at the time of the sale. Sorting through all of this, the trial court ultimately granted the Camps' summary judgment motions, finding that Defendants defaulted on their payment obligations and rejecting their efforts to escape the governing contracts. After reviewing the appeal and cross-appeal, we conclude that the trial court got it right and affirm its judgment in full.

I.

{¶2} In January 2016, the Camps sold their business, CSE, to Mr. Gerwin pursuant to a Stock Purchase Agreement ("SPA") wherein he agreed to purchase all issued and outstanding shares of CSE. A prototypical transaction document, the SPA contained various representations and warranties regarding the assets of CSE, including that "all inventory of the business recorded and unrecorded on the Company's balance sheet as of the Closing Date ("the inventory"), as shown on Schedule 6.18, * * * shall be at least equal to the amount shown on Schedule 6.11 for Inventory as of the Closing Date." The survival provision of the SPA provided that all covenants, agreements, representations, and warranties expressed in the agreement "shall survive the Closing for a period of five (5) years from the Closing Date." The

SPA also included a setoff provision, allowing either party to deduct any amount owed to them under the agreement from any amount owed by them under the agreement.

{¶3} In connection with the transaction, CSE executed a promissory note ("Note") in favor of Mr. Camp, and Mr. Gerwin executed a guaranty of payment ("Guaranty"). Under the Note, CSE agreed to pay Mr. Camp $371,950 over a period of time with annual interest of five percent. And under the Guaranty, Mr. Gerwin personally and unconditionally guaranteed the payment of certain debts under the Note, including: (1) the outstanding principal balance of $371,950 plus applicable interest, (2) a Bank of America credit card with an outstanding balance of $20,541.29 at closing, and (3) a Discover credit card with an outstanding balance of $11,342.29 at closing.

{¶4} After the transaction closed, Mr. Gerwin began operating CSE. From the outset, however, he uncovered accounting discrepancies related to CSE's inventory and accounts payable, spurring him to close the business for two weeks to perform an inventory count. This deep dive into the books and records allegedly uncovered that the inventory amount disclosed in the SPA was short by almost $100,000. Despite this shocking discovery, Mr. Gerwin stayed mum about it and said nothing of consequence to Mr. Camp.

{¶5} About two and a half years later, as CSE struggled financially, the Camps and CSE executed an amended promissory note ("Amended Note"). The Amended Note acknowledged that the outstanding balance on the Note was $361,860, amended the amortization schedule of the Note, and extended its maturity date. The parties also ratified and reaffirmed the remaining terms and conditions of the Note and the Guaranty in the Amended Note. Throughout the negotiations leading to this amended document, Mr. Gerwin raised no objection about the missing inventory.

{¶6} In December 2020, more than two years after the ratification of the Amended Note, Mr. Camp and Defendants entered into an Inventory Agreement, which reduced the principal amount owed by Defendants under the Note and Guaranty by $150,000 in exchange for the transfer of "substantially all" of CSE's inventory from Defendants back to Mr. Camp. In the Inventory Agreement, Defendants acknowledged that CSE and Mr. Gerwin jointly and severally owed Mr. Camp the original principal amount of $371,950 under the Note, as amended by the Amended Note, and the Guaranty. They also expressly acknowledged and agreed that the Note and Guaranty were in default, and that Mr. Camp had accelerated the remaining principal and accrued and unpaid interest. Again, Mr. Gerwin raised no objection at this time about missing inventory, even in the midst of negotiating an *Inventory* Agreement. And phantom inventory or no, he agreed to transfer all of the inventory back to Mr. Camp.

{¶7} In November 2021—nearly one year after the Inventory Agreement and almost six years after closing—Mr. Camp filed a complaint against Defendants, alleging breach of the Note and the Guaranty and requesting attorney fees. Defendants subsequently filed an answer and counterclaim against Mr. Camp, claiming breach of the SPA, fraud, and breach of a noncompete agreement. Defendants contemporaneously filed a separate action against Ms. Camp, asserting the same breach of the SPA and fraud claims based on the same events. Eventually, the trial court consolidated both cases.

{¶8} In April 2022, Mr. Camp filed a partial motion for summary judgment on all three counts asserted in the complaint. After receiving an extension of time to conduct discovery, Defendants opposed the summary judgment motion. On the date of the scheduled summary judgment hearing, the Camps filed a second motion for summary judgment,

4

targeting the counterclaims asserted against them by Defendants. Defendants again filed a response in opposition to that summary judgment motion.

{¶9} In January 2023, the trial court granted the summary judgment motions, awarding judgment against Defendants, jointly and severally, in the amount of $221,143.74 plus interest and costs and reasonable attorney fees. The entry further provided that "Plaintiff shall submit said attorney's fees to the Court by Motion and Affidavit." And it included the following language: "This is a final appealable order and there is no just cause for delay."

{¶10} Following that judgment, the Camps filed a motion to correct a clerical error under Civ.R. 60(A), asserting the trial court's entry omitted the amounts owed for the corporate credit cards under the Guaranty. In response, Defendants cried foul, pointing out that Mr. Camp did not seek explicit damages for the credit card debt in his motion for summary judgment and that the court awarded the exact amount that he had requested. The court denied the motion without explanation. The trial court's judgment triggered an appeal (by Defendants) with three assignments of error, and a cross-appeal (by the Camps) with one assignment of error.

II.

{¶11} As a preliminary matter, we must address whether the trial court's summary judgment entry constitutes a final, appealable order. Generally, a final, appealable order must resolve the whole case or a distinct claim or claims and be certified by Civ.R. 54(B). We will address appealability regarding the resolution of two claims: (1) Mr. Camp's claim against Mr. Gerwin for nonpayment of the credit card obligations under the Guaranty, and (2) Mr. Camp's claim for attorney fees.

{¶12} Mr. Camp's claim against Mr. Gerwin for nonpayment of the credit card obligations under the Guaranty was fully resolved by the trial court's entry. The Camps, in

5

their cross-appeal, contend that the trial court erred in failing to award them all of their damages, alleging the trial court incorrectly omitted the credit card debt from its award of damages in its entry granting their motions for summary judgment. The dissent seems to take the position that the Guaranty was not at issue in the motion for partial summary judgment, since Mr. Camp limited the relief sought in the motion to claims under the Note. But we see things differently—the trial court adjudicated claims under the Guaranty at summary judgment. After all, the Note only implicates CSE. The purpose of the Guaranty was to put Mr. Gerwin personally on the hook for the obligations under the Note. As such, because the court entered judgment against Mr. Gerwin personally, it necessarily concluded that the partial summary judgment motion included claims under both the Note and the Guaranty.

{¶13} Further, throughout the partial motion for summary judgment, Mr. Camp expressly indicated that he was seeking relief under both the Note and Guaranty. He even stated: "Accordingly, because there are no genuine issues of material fact, Mr. Camp is entitled to judgment against Gerwin and CSE on the Note and the Guaranty as a matter of law."

{¶14} On the other hand, while Mr. Camp's claim for attorney fees was not fully resolved by the trial court, the claim is distinct from the fully-resolved claims at issue in this appeal. The entry awarded attorney fees but did not establish any particular amount. It also invoked the language of Civ.R. 54(B), providing: "This is a final appealable order and there is no just cause for delay."

{¶15} The inclusion of Civ.R. 54(B) language does not magically transform all non-final orders that fail to dispose of a single claim in its entirety into final ones. *See LEH Properties v. Pheasant Run Assn.*, 9th Dist. Lorain No. 07CA9275, 2008-Ohio-4500, ¶ 11

6

("[T]he mere inclusion of Civ.R. 54(B) language will not remedy a non-final order, which fails to dispose of a single claim in its entirety."). And the mere mention of attorney fees in the complaint does not rise to the level of a separate claim for relief. *Evanston Acquisitions, LLC v. STAG II Dayton, LLC*, 2d Dist. Montgomery No. 27480, 2017-Ohio-5755, ¶ 8. But when a party brings a separate contractual claim for attorney fees (as Mr. Camp did here), the trial court may enter an award of fees without determining an amount and still render the order final and appealable through the mechanism of the Civ.R. 54(B) language. *See Internatl. Bd. of Elec. Workers, Local Union No. 8 v. Vaughn Industries, LLC.*, 116 Ohio St.3d 335, 2007-Ohio-6439, 879 N.E.2d 187, ¶ 2 ("We also hold that when attorney fees are requested in the original pleadings, an order that does not dispose of the attorney-fee claim and does not include, pursuant to Civ.R. 54(B), an express determination that there is no just reason for delay, is not a final, appealable order."); *Evanston Acquisitions* at ¶ 7-11 ("A decision that awards attorney fees but does not specify the amount is likewise not final and appealable without a Civ.R. 54(B) certification.").

{¶16} Consistent with this authority, although the attorney fees amount remains undetermined, because it was presented by a separate claim under a specific contractual provision for fees, the trial court rendered the order final and appealable by including Civ.R. 54(B) language.

{¶17} Satisfied with our jurisdiction, we can accordingly proceed to consider the merits of the parties' arguments.

III.

{¶18} We begin with Defendants' claim that the trial court erred in granting Mr. Camp's motion for partial summary judgment. We review this issue "de novo, conducting an independent review of the record to determine the propriety of summary judgment." *Meyer*

7

*Tool, Inc. v. Mikrolar, Inc.*, 2023-Ohio-704, 210 N.E.3d 602, ¶ 9 (1st Dist.), citing *Al Neyer, LLC v. Westfield Ins. Co.*, 2020-Ohio-5417, 163 N.E.3d 106, ¶ 13 (1st Dist.).

> " 'Under Civ.R. 56(C), summary judgment is proper where the moving party establishes that "(1) no genuine issue of any material fact remains, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and construing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made." ' "

*Id.*, quoting *Al Neyer* at ¶ 14, quoting *State ex rel. Duncan v. City of Mentor City Council*, 105 Ohio St.3d 372, 2005-Ohio-2163, 826 N.E.2d 832, ¶ 9.

### A.

**{¶19}** In their first assignment of error, Defendants insist that the trial court erred in finding that CSE breached the Note. This argument contains four branching paths: (1) the trial court did not first determine any right to a setoff before finding a breach; (2) the Camps did not perform under the contract; (3) Defendants properly pleaded an affirmative defense based on fraud and, as a result, fraud invalidates the contracts; and (4) the statute of limitations did not preclude their affirmative fraud defense. Because the first and second issues raised involve Defendants' claims that the trial court erred in finding that the Camps did not breach the SPA, we will consider them with the second assignment of error (concerning the Camps' alleged breach of the SPA) below. Defendants' third and fourth issues intertwine, so we will consider them together for ease of analysis.

**{¶20}** The fraud claim pursued by Defendants essentially accuses the Camps of misrepresenting the nature of the inventory. But this claim trips over an insurmountable

statute of limitations hurdle. The statute of limitations for a cause of action for fraud is four years, *see* R.C. 2305.09(C), and when they filed the answer, nearly six years had elapsed since the closing and Mr. Gerwin's discovery of the alleged fraud. Tacitly acknowledging the point, Defendants do not attempt to rehabilitate their fraud claim on appeal.

{¶21} Instead, they seek to recast it as an affirmative defense, seizing upon the last sentence of Civ.R. 8(C): "When a party has mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the court, if justice so requires, shall treat the pleading as if there had been a proper designation." This provision "was intended to permit trial courts to overlook clerical errors made in designating counterclaims and affirmative defenses, but it was not designed as a means by which a party may correct a substantive error in pleadings long after the time for amendment to those pleadings has passed." *Canty v. Vandegrift*, 10th Dist. Franklin No. 92AP-1317, 1993 Ohio App. LEXIS 1723, 18-19 (Mar. 23, 1993), citing *Millar v. Bowman*, 13 Ohio App.3d 204, 206, 468 N.E.2d 754 (12th Dist.1983).

{¶22} Nothing in the record suggests that Defendants mistakenly designated fraud as a counterclaim rather than an affirmative defense. A party may use fraud as either "an affirmative defense to defeat the contract" or "as a counterclaim to recover damages on the contract." *Id*. at 19. Here, rather than attempt to rescind the contract and avoid the obligations thereunder, Mr. Gerwin chose to assert a counterclaim to recover damages on the underlying contract. That tactical choice does not seem to be the product of mistake or a clerical oversight.

{¶23} Consistent with this litigation position, Mr. Gerwin admittedly knew of the alleged misrepresentations in the SPA shortly after the ink dried on the contract, yet he did not try to extricate himself from the agreement and instead continued to operate CSE for nearly five years. He even entered into subsequent agreements—the Amended Note and the

Inventory Agreement—whereby he ratified all the terms and conditions of the Note that were unchanged by the agreement and acknowledged the Note and Guaranty were in default. And "[i]n Ohio, one who performs a contract after learning of fraud in its inducement ratifies the contract and may not subsequently disaffirm it." *Hawes v. Downing Health Techs L.L.C.*, 8th Dist. Cuyahoga No. 110920, 2022-Ohio-1677, ¶ 54.

**{¶24}** We accordingly see no reason why the fraud counterclaim should be recategorized as an affirmative defense under Civ.R. 8(C), and we reject Defendants' fraud-based arguments.

B.

**{¶25}** In their second assignment of error, Defendants allege that the trial court erred in finding that the Camps did not breach the SPA. Specifically, Defendants raise three issues: (1) their breach claim is not time barred, (2) the Camps did not perform under the SPA, and (3) the trial court erred when it did not determine the setoff amount. We will address each of those issues in turn.

**{¶26}** Defendants first argue that their claim that the Camps breached the SPA is not time-barred. The Camps, on the other hand, point to the survival provision contained in Section 14.1 of the SPA, which provides the representations and warranties only survived closing for five years. Since more than five years had passed from the closing by the time the lawsuit was filed, the Camps maintain that these provisions bar any claim for breach.

**{¶27}** We are unpersuaded by the Camps' efforts to bar the claim based on Section 14.1. The Sixth Circuit considered whether survival provisions (akin to those at issue here) are permissible contractual modifications of the applicable statute of limitations in *Arcade Co., Ltd. v. Arcade, LLC*, 105 Fed.Appx. 808 (6th Cir.2004). The court looked to the plain language of the provision (which contained language similar to the survival provision in this

case), and because the provision did not purport to limit any "action," "lawsuit," or "demand," the court concluded that the parties did not adequately convey an intention to modify the statute of limitations. *Id.* at 811. "Statutes of limitation exist to provide finality for potential litigants," so the court reasoned that any agreements purporting to limit finality "must be made manifest in clear, unequivocal language." *Id.* Subsequently, an Ohio appellate court applied the *Arcade Co.* analysis to a survival provision, finding that a survival clause did not establish a contractual limitations period when it did not contain "unequivocal language" purporting to "limit an action, lawsuit, or demand." *Shoregate Towers Partners L.L.C. v. Antebi*, 8th Dist. Cuyahoga No. 109817, 2021-Ohio-2688, ¶ 107-108.

**{¶28}** We find that basic reasoning persuasive, and we likewise see no such language purporting to restrict the statute of limitations in Section 14.1. Accordingly, the survival clause does not operate to shorten the six-year statute of limitations, and Defendants' breach claim is not time-barred.

**{¶29}** But just because the claim is timely does not render it meritorious. We accordingly next address Defendants' allegation that the Camps did not perform under the SPA. Specifically, Defendants maintain that because the Camps failed to deliver nearly $100,000 in inventory, they did not materially perform under the contract. The SPA contained an asset provision—Section 1.2—stating: "all inventory of the Business recorded and unrecorded on the Company's balance sheet as of the Closing Date (the "Inventory"), as shown on <u>Schedule 6.18</u>, it being agreed to by the parties that such Inventory shall be at least equal to the amount shown on Schedule 6.11 for Inventory as of the Closing Date." (Emphasis sic.)

**{¶30}** Defendants' position, however, begs more questions than it answers. First, the nature of the claimed breach remains unclear—Defendants' briefs and motions do not clearly

explain if the discrepancy in inventory involved the valuation of the inventory or the inventory items received. For example, if the SPA promised inventory including 1,000 widgets, and the Camps only delivered 900 widgets, Defendants could attack the paucity of items received. By contrast, if the Camps promised inventory valued at $1,000 yet only delivered inventory totaling $900, Defendants would need to present valuation evidence of the inventory, presumably through an expert or similar means to establish how the Camps failed to deliver an appropriately valued inventory.

**{¶31}** Under either scenario, we need to review the contractual requirements and measure them against the concomitant evidence. Schedule 6.18 seems to be the key to this conundrum since it presumably explains exactly what inventory (either in terms of items or valuation) must be delivered. But unfortunately, it does not appear in the record. While Mr. Gerwin provided testimony alleging the breach, he did not produce a copy of Schedule 6.18. Nor did he provide any details of the inventory count that allegedly revealed the discrepancies, a list of missing items, or details of a flawed valuation of the items received (nor do we see any expert testimony on this point).

**{¶32}** To demonstrate there is a genuine issue of material fact regarding the breach claim, Defendants needed to establish the inventory promised in the SPA—Schedule 6.18— and evidence demonstrating what specific inventory was not delivered or was incorrectly valued. Without such evidence in the record, there is nothing to present to a jury to establish a breach.

**{¶33}** Beyond these record problems, Defendants' own conduct dooms their breach claim. Years after the alleged breach, Defendants entered into the Inventory Agreement which acknowledged default under the Note and Guaranty: "The Loan Documents are in default and the entire unpaid principal balance and accrued and unpaid interest have been

accelerated." By acknowledging default, Defendants "conduct[ed] [themselves] in a manner inconsistent with an intention to insist on that term." *See Vivi Retail, Inc. v. E & A Northeast Ltd. Partnership*, 8th Dist. Cuyahoga No. 90527, 2008-Ohio-4705, ¶ 30. In other words, Defendants' present litigation position is that the Camps' predicate breach essentially excuses their performance under the Note and Guaranty. But by acknowledging a default, they have taken a position fundamentally at odds with that claim. Beyond that, by transferring all of the inventory back to the Camps, they received a negotiated value for the inventory, warts and all. The positions taken by Defendants, particularly in the Inventory Agreement, ultimately operate to waive the particular breach claim that they present on appeal.

**{¶34}** Relatedly, Defendants allege that the trial court erred in awarding summary judgment because it did not determine any setoff amount owed to them. Pointing to Section 14.2.4 of the SPA, they contend that the trial court could not determine whether a breach of the Note occurred until it determined CSE's and Mr. Gerwin's setoff rights. Section 14.2.4 provides:

> "Notwithstanding anything contained herein to the contrary, Buyer and/or Company may setoff any amount owed to it by Seller pursuant to the indemnification or other provisions of this Agreement against any amount owed by Buyer and/or Company to Seller under this Agreement including, without limitation, the obligation of Company under the Camp Note, or any agreement or document contemplated hereby."

**{¶35}** But the SPA does not provide, or even suggest, that a claim for setoff precludes a breach of the Note or Guaranty. At most, under Section 14.2.4, Defendants could reduce the amount they owe under the Note (or by extension the Guaranty) with a viable setoff claim. Ultimately, because their setoff theory hinges entirely on the inventory point that we

discussed above, Defendants fail to establish a genuine issue of fact as to whether they are entitled to a setoff of any amount. Accordingly, Defendants cannot prevail on their breach or setoff arguments. We thus overrule Defendants' first and second assignments of error.

C.

**{¶36}** In their third assignment of error, Defendants claim that the trial court erred by excluding evidence produced by Mr. Gerwin in opposition to the Camps' summary judgment motions. But we see no indication in the record that the trial court failed to consider any evidence submitted on summary judgment. As the Camps emphasize, the trial court's entry explicitly states that it reviewed "all materials provided in support and against the Motions." And regardless, this court considered all evidence in the record when evaluating this appeal.

**{¶37}** Therefore, we overrule Defendants' third assignment of error.

III.

**{¶38}** Turning to the Camps' cross-appeal, they contend that the trial court erred in failing to award them all of their damages. Specifically, they maintain that the trial court incorrectly omitted the credit card debt from its award of damages in its entry granting their motions for summary judgment. In this respect, they insist that the credit card issue was before the court on the motion for partial summary judgment, and they even moved the trial court to correct a clerical error in the judgment when it failed to account for the credit card fees in its judgment.

**{¶39}** In his initial complaint, Mr. Camp provided the amount owed on the credit cards. Yet he failed to include this amount in his motion for partial summary judgment, nor did he include the amount in his overall computation of damages. Although his motion flagged the credit card debt issue (emphasizing: "The guaranty also contained promises from

14

Gerwin, personally guaranteeing payment of the Bank of America and Discover Credit cards"), Mr. Camp failed to present any Civ.R. 56 evidence to substantiate the alleged credit card damages: he did not proffer any credit card statements or evidence substantiating the amount owed on the credit cards. Without such evidence, he cannot prevail on his claim.

{¶40} While he appeared to claim damages for the credit cards in his partial summary judgment motion (as the reconsideration motion ratified), he explicitly sought damages of $221,143.74 plus interest and fees, without any mention of the money owed on the credit cards. Ultimately, the trial court granted Mr. Camp what he sought, damages of $221,143.74 plus interest and fees.

{¶41} We see no error in the trial court's decision not to award damages that were unsupported by evidence, and we therefore overrule this assignment of error.

\* \* \*

{¶42} In light of the foregoing analysis, we overrule all three of Defendants' assignments of error, overrule the Camps' sole cross-assignment of error, and affirm the trial court's judgment.

Judgment affirmed.

**Kinsley, J.**, concurs.
**Zayas, P.J.**, dissents.

**Zayas, P.J.**, dissenting.

{¶43} I respectfully dissent because I would hold that the order appealed from is not a final, appealable order.

{¶44} "By definition, a final appealable order disposes of the whole case or some separate and distinct branch thereof." *RBS Citizens, NA v. Sharp*, 2015-Ohio-5438, 47 N.E.3d 170, ¶ 6 (7th Dist.), citing *Noble v. Colwell*, 44 Ohio St.3d 92, 94, 540 N.E.2d 1381 (1989). "An order granting partial summary judgment is not separate and distinct when the issue

15

determined is based on the same facts and circumstances as the claims that remain pending before the court." *Id.*; *see, e.g., Kinzel v. Ebner*, 2020-Ohio-4165, 157 N.E.3d 898, ¶ 98 (6th Dist.), quoting *Internatl. Managed Care Strategies, Inc. v. Franciscan Health Partnership, Inc.*, 1st Dist. Hamilton No. C-010634, 2002-Ohio-4801, ¶ 9 (" '[W]here claims arise from the same alleged conduct, they are inextricably intertwined and not appealable despite Civ.R. 54(B) certification.' ").

{**¶45**} A review of the pleadings reveals that the instant appeal ultimately involves seven claims deriving from the exact same facts and circumstances: (1) Mr. Camp's claim against CSE for breach of the Note, (2) Mr. Camp's claim against Mr. Gerwin for breach of the Guaranty, (3) Mr. Camp's claim against CSE and Gerwin for attorney fees "pursuant to the note and guaranty," (4) Mr. Gerwin and CSE's counterclaim against Mr. Camp for breach of the SPA, (5) Mr. Gerwin and CSE's counterclaim against Mr. Camp for fraud, (6) Mr. Gerwin and CSE's claim against Mrs. Camp for breach of the SPA, and (7) Mr. Gerwin and CSE's claim against Mrs. Camp for fraud. Among these claims, one inextricably intertwined issue remains unresolved: Mr. Camp's claim against Mr. Gerwin for breach of Guaranty based on nonpayment of the credit-card obligations.

{**¶46**} Mr. Camp's claim against Mr. Gerwin derives from the Guaranty in which Mr. Gerwin guaranteed the payment of five distinct obligations, to and for the benefit of Mr. Camp. Three of these obligations are relevant here. First, he guaranteed payment of "that certain Amended and Restated Promissory Note from [CSE]." Next, he guaranteed the payment of "that certain Bank of America credit card shown in the trade payables of [CSE]."

16

Last, he guaranteed the payment of "that certain Discover credit card shown in the trade payables of [CSE]."[1]

**{¶47}** In April 2022, Mr. Camp moved for *partial* summary judgment on his claims against CSE and Mr. Gerwin. The motion expressly stated that Mr. Camp was seeking "partial summary judgment on the issues of: (1) whether [Mr. Gerwin and CSE] jointly and severally owe Mr. Camp certain sums *under a promissory note* [the Note], and (2) the amount due *under said Note*." (Emphasis added.) The motion sought judgment for the exact amount of damages due under only the Note, "plus fees, costs, advances, and expenses allowable *under the Note*." (Emphasis added.) Yet, the majority treats the issue of Mr. Gerwin's liability for the credit-card damages—a claim which arises under separate and distinct obligations of the Guaranty unrelated to the Note—as included with the partial summary-judgment motion and proceeds to hold that such claim was appropriately denied for lack of evidence in the record. Because the record shows differently,[2] I hold that the claim for credit-card damages was never

---

[1] For clarification, these obligations originate from Article 2 of the SPA, entitled "Certain Obligations." With respect to the Note, Article 2 provides that Mr. Camp made certain loans to CSE over the course of the business, as evidenced by the Note, and that "[s]uch payment obligations shall be guaranteed by [Gerwin] at Closing." With respect to the credit card obligations, Article 2 provides that the company was the debtor on a Bank of America credit card and a Discover credit card, and that such obligations were to remain outstanding at Closing.

Consistent with the SPA, a review of the Note reveals that the Note *solely* provides that CSE promises to pay Camp a principal balance consistent with the Note provision under Article 2. The Note does not mention any credit card obligations, nor does it provide any further promises to pay any other balance. Thus, it is clear that the credit card obligations are separate and distinct from the Note, and do not derive from the Note.

[2] To be sure, the only mention of credit-card obligations in the motion was in one sentence—of an 11-page motion—that supposedly "flagged," as the majority posits, the issue of the credit-card damages. However, a review of the motion as a whole reveals that, despite the brief mention of the credit-card obligations in one factually correct sentence, neither the motion nor the paragraph containing the aforementioned sentence actually seek judgment on this issue. The paragraph in question states:

> In this case, Mr. Camp averred in his complaint that he is the holder of the original Note, and entitled to enforce the same. This allegation is not disputed. Further, the Note was signed on January 27, 2016 by Gerwin as sole [sic] member of CSE, and contained an unconditional promise to pay Mr. Camp, separate and apart from the SPA. The Note contained a ten (10) year term. Gerwin executed a personal guaranty on the same day, under which Gerwin unconditionally guaranteed the payment of the Note. Mr. Camp is the holder of the guaranty. The guaranty also contained promises from Gerwin, personally guaranteeing payment of the Bank of America and Discovery Credit [sic] cards.

17

expressly or otherwise included within the summary-judgment motion and therefore remains outstanding.[3]

**{¶48}** Consequently, I would hold that the order appealed from is not a final, appealable order as all the claims in this case derive from the exact same set of facts and circumstances, regardless of the claimant, thereby making them inextricably intertwined for purposes of appeal. Accordingly, I would dismiss the appeal as this court lacks jurisdiction to consider the appeal.

Please note:

The court has recorded its entry on the date of the release of this opinion.

---

[3] The majority asserts that I am of the position that the Guaranty was not at issue in the motion for partial summary judgment. This is a mischaracterization. The motion for summary judgment sought liability against CSE and Mr. Gerwin on the Note. The Note itself is only between Mr. Camp and CSE. Therefore, the Guaranty is necessarily included within the summary judgment motion to the extend of Mr. Gerwin's liability under the Note because liability cannot be obtained against Mr. Gerwin without inclusion of the Guaranty. However, unlike the majority, I do not see the motion as extending to Mr. Gerwin's liability for the credit-card obligations under the Guaranty as the credit cards are unrelated to the Note. As such, the correct characterization of my position is that Mr. Gerwin's liability under the Guaranty *for the credit cards* was not at issue in the motion for partial summary judgment.

In support of its position that the credit cards were included within the summary judgment motion, the majority points to a sentence in the motion where Mr. Camp states that he is seeking judgment on both the Note and the Guaranty. However, a review of the portion of the motion discussing why the Guaranty is in default reveals that the argument was only concerning the Guaranty being in default in relation to the Note. More specifically, the motion states, "the Note and Guaranty are in default for failure to make payments when due," and points to paragraphs 9 and 10 of Mr. Camp's affidavit in support of this statement. In paragraphs 9 and 10 of his affidavit, Mr. Camp avers, "Gerwin and CSE agreed in the Inventory Agreement that the Note is in default. Because the Note is in default, the Guaranty is also in default."