[Cite as *Manter v. CPF Senior Living – Northgate Park L.L.C.*, 2024-Ohio-1385.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| PAUL J. MANTER, | : | APPEAL NO. C-230478 |
| | | TRIAL NO. A-2104337 |
| Plaintiff-Appellant, | : | |
| | | *O P I N I O N.* |
| vs. | : | |
| | | |
| CPF SENIOR LIVING – NORTHGATE PARK LLC, | : | |
| | : | |
| GRACE MANAGEMENT, INC., | : | |
| and | : | |
| NORTHGATE PARK, LLC, | : | |
| Defendants-Appellees. | : | |

Civil Appeal From:   Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed in Part and Reversed in Part, and Cause Remanded

Date of Judgment Entry on Appeal: April 12, 2024

*Ferris & Manter,* and *James K. Ferris*, for Plaintiff-Appellant,

*Plunkett Cooney, PC*, and *Christina L. Corl*, for Defendants-Appellees.

**KINSLEY, Judge.**

{¶1} Plaintiff-appellant Paul Manter appeals from the trial court's grant of summary judgment in favor of defendants-appellees CPF Senior Living – Northgate Park, LLC, Grace Management, Inc., and Northgate Park, LLC, (collectively, "Northgate"). Paul[1] asserts six assignments of error.

{¶2} First, he argues that the trial court erred in granting summary judgment in favor of Northgate when genuine issues of material fact existed for trial. Second, he argues that the trial court erred as a matter of law in concluding Northgate was not a nursing home under R.C. Chapter 3721, but rather a residential facility under R.C. 5119.34 and 5123.19. Third, he argues that the trial court erred as a matter of law in finding he failed to identify a source of duty as to his negligence claim. Fourth, he argues that the trial court erred in finding Northgate's breach of a "Residence and Services Agreement" ("RSA") could not constitute a breach of duty under his negligence claim. Fifth, he argues that genuine issues of material fact existed as to his breach of contract claim. And sixth, he argues that the trial court erred in finding his claim for intentional infliction of emotional distress ("IIED") failed.

{¶3} We overrule Paul's first assignment of error, because the specific factual disputes Paul raises were immaterial to resolving his claims. We sustain Paul's second assignment of error, because the trial court erred as a matter of law in finding that Northgate was licensed under R.C. 5119.34 and 5123.19. Further, because the rights described in R.C. 3721.13 may be a source of duty Northgate owed Paul independent of their contractual obligations, we sustain Paul's third assignment of error. But we overrule Paul's fourth assignment of error, because a breach of contract does not

---

[1] Because Paul and his son, Aaron Manter, share a last name, we refer to them by their first names.

create a source of duty for a tort claim under Ohio law. We sustain Paul's fifth assignment of error, because genuine issues of material fact existed as to the kind of care Paul needed and actually received. Lastly, we overrule Paul's sixth assignment of error, because Northgate's conduct did not rise to the level of extreme and outrageous conduct required to sustain an IIED claim.

{¶4} The judgment of the trial court is accordingly affirmed in part and reversed in part, and the cause is remanded for further proceedings on Paul's remaining claims.

### Factual and Procedural Background

{¶5} Paul is in his mid-70s and suffers from hypertension, hyperlipidema, chronic obstructive pulmonary disease, congestive heart failure, and neuropathy in his extremities. He also struggled with alcoholism. Due to these health ailments, Paul's son, Aaron Manter, convinced him to move into an assisted living facility.

{¶6} On October 5, 2018, Paul entered into the RSA with Northgate. The RSA identified Northgate as an assisted living community and specified the following:

5.1 Observation and Consultation.

Community staff will observe your health status to identify and help you respond to your dietary, social and personal needs by way of a nursing assessment. Consultations will be determined by the Wellness Director.

* * *

5.5 Personal Assistance and Care

[Northgate] provides different levels of personal assistance and care, depending on your needs. Upon admission to [Northgate], the staff performed a comprehensive assessment of your needs. We determined

with you, in accordance with [Northgate's] Resident Assessment, that your appropriate care service package is Level ONE * * * ***Staff will reassess you regularly to determine the level of personal assistance and care that you need.***

* * *

5.7 Excluded and Non-Covered Services.

This Agreement does not entitle you to receive any services for * * * any condition requiring services that [Northgate] is not licensed, staffed, or equipped to provide, or does not routinely provide.

5.8 Skilled Nursing Care

We do not provide Skilled Nursing Care at the Northgate Park except the Administration of medication hypodermically or orally by the Community's Licensed staff. Any other Skilled Nursing Care must be provided by an Outside provider. Per Ohio's Administrative Code Rule 3701-17-50, the Term "Skilled Nursing Care" shall mean procedures that require technical skills [and] Knowledge beyond those the untrained possesses and that are commonly employed in providing for the physical, mental and emotional needs of the ill or otherwise incapacitated. 'Skilled Nursing Care' includes, but is not limited to, the following:

* * *

Objective observation of changes in the resident's condition as a means of analyzing and determining the nursing care required and the need for further medical diagnosis and treatment

4

(Emphasis added.)

{**¶7**} Initially, under Paul's "Level of Care Evaluation" ("care plan") Northgate was not required to assist Paul with bathing. Instead, Care Connection of Cincinnati, LLC, ("Care Connection") a home healthcare provider, would assist Paul with showering twice a week. Later, because Paul was not bathing himself, his care plan was modified to include the following: "Requires stand-by *or* hands-on assistance from caregiver (***wash back and feet***) for bath/shower 2-3 times a week[.] Sundays and Thursday[s] 2nd Shift." (Emphasis added.)

{**¶8**} On December 29, 2019, Paul was admitted to the hospital after suffering a fall at Northgate. An ulcer was discovered on Paul's left foot, which continued to deteriorate during his stay at the hospital. After several failed procedures to salvage his left foot, Paul's left leg was amputated below the knee on February 5, 2020.

{**¶9**} Paul filed his complaint against Atria Northgate Park, LLC, CPF Senior Living – Northgate Park, LLC, HCP Cincinnati OH OPCO, LLC, Grace Management, Inc., Northgate Park Senior Living, and Care Connection on December 20, 2021. He alleged claims of negligence, spoliation, breach of contract, IIED, unjust enrichment, and violation of his rights under R.C. 3721.13 and 3721.14. Defendants HCP Cincinnati OH OPCO, LLC, Atria Northgate Park, LLC, and Care Connection were later dismissed with prejudice.

{**¶10**} The remaining parties conducted discovery, including the depositions of Paul, Aaron, and current and former Northgate staff. In his deposition, Paul testified that due to his previous struggles with alcoholism, he had very little memory of what transpired during his time at Northgate, including his fall which led to his hospitalization. He recalled Northgate staff taking him to shower, observing him

bathing, and cleaning his back at times. He admitted that he probably refused baths. He also described the Northgate staff as courteous and kind. He believed they had a tough job to do, and he never held anything against them.

{¶11} Aaron also testified to Paul's memory issues. He testified that Paul had short-term memory loss due to his alcoholism. In January 2019, Aaron received a call from Northgate staff informing him that Paul was not bathing appropriately and that Paul would be bathed twice a week by Northgate staff. In March 2019, Paul's primary care physician informed Paul that he would require wound care. According to Aaron, the wounds developed on Paul's feet from water retention that swelled and caused Paul's skin to crack. Though Care Connection was dressing these wounds for Paul, Aaron was not aware that Care Connection was involved in Paul's care until he requested nursing notes from Northgate after Paul's hospitalization.

{¶12} Aaron frequently visited Paul at Northgate. He often noticed a bad odor from Paul during his visits, which Aaron thought might have been because Paul did not do his laundry regularly. Paul was typically wearing socks and shoes when Aaron visited him. But on one occasion, Aaron noticed Paul jerked when Aaron grabbed his feet to change Paul's socks. And on another occasion, Aaron brought Paul new shoes, and Paul complained that it felt as though something was in his shoe. Aaron, however, did not speak to anyone at Northgate regarding these issues.

{¶13} Rosemarie Caldwell, executive director during Paul's time at Northgate, testified that Northgate was a residential care facility, not a nursing home. According to Caldwell, Northgate had on staff a wellness director, nurses to administer medication, and resident assistants to carry out resident care plans. Caldwell could not explain why there were no nursing notes for Paul between January 2019 and

August 2019 nor any documentation of Paul's bathing schedule. She agreed, however, that if Paul was noncompliant with bathing, that was something she would expect to see in the nursing notes.

{¶14} Stephanie Watkins, former wellness director at Northgate, testified that charting for residents was typically done only when something was abnormal. She also agreed that bathing records should have been included when charting for a resident. She testified that Paul's care plan was modified to include bathing because Northgate staff smelled an odor outside of his unit. She made this modification after speaking to both Paul and Aaron. She admitted that bathing was not a skilled nursing task. And she maintained that as an assisted living facility, Northgate resident assistants would not do skin checks or monitor wounds.

{¶15} When questioned as to the definition of stand-by bathing assistance, Watkins testified that was limited to reminding residents to bathe and that resident assistants would do nothing further to assist in bathing. She also clarified that Paul was receiving stand-by bathing assistance, not hands-on bathing assistance.

{¶16} But Karen Kuntz, a staff nurse at Northgate, testified that stand-by assistance meant encouraging the resident to shower and standing nearby to ensure the resident did not fall. She testified that hands-on bathing assistance would entail physically bathing the resident. She did not, however, find the gap in nursing notes to be odd.

{¶17} Dr. Kevin D. Nolan, M.D., a vascular surgeon, opined on behalf of Northgate. He opined that Northgate's staff would not have the training to either identify the ulcer on Paul's left foot or understand that he should have been referred for medical treatment. He further opined that Paul's left leg was amputated because

of his poorly controlled vascular disease leading to deterioration of the ulcer. And he opined that Paul's foot was salvageable upon arrival at the hospital.

{¶18} Dr. Steven Levin, M.D., a vascular, cardiac, and general surgeon, offered an opinion on behalf of Paul. He opined that Paul's left leg could have been saved if he had received the basic hygiene care he had contracted for by Northgate. He also opined that if Aaron had been notified that Paul continued to refuse bathing, he could have spoken with Paul regarding the issue.

{¶19} On December 8, 2022, Northgate moved for summary judgment, which the trial court granted. In its decision, the trial court reasoned that Paul's negligence claim was encompassed by his breach of contract claim. It further found that Paul's spoliation claim failed, because Northgate staff testified that regular note taking was not standard practice. It also found that Northgate did not breach its contractual duties regarding bathing, because Paul had only contracted for stand-by bathing assistance, which he was provided, and Paul's testimony regarding bathing was unreliable due to his medical conditions. It concluded Paul's IIED claim failed, because Paul testified that Northgate staff were nothing but kind and courteous towards him, which hardly met the high bar of extreme and outrageous conduct. It also found that in the absence of allegations of fraud or bad faith, Paul's unjust enrichment claim was without merit. Lastly, it found that Northgate was not a nursing home as defined in R.C. Chapter 3721, but rather was a residential facility under R.C. 5119.34 and 5123.19. Accordingly, Paul was not afforded the same protections as a resident of a home under R.C. 3721.01(A)(1)(a).

{¶20} Paul now appeals.

### Standard of Review

**{¶21}** Summary judgment decisions are reviewed de novo. *Al Neyer, LLC v. Westfield Ins. Co.*, 2020-Ohio-5417, 163 N.E.3d 106, ¶ 13 (1st Dist.). Summary judgment is proper under Civ.R. 56(C) where "(1) no genuine issue of material fact remains, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and construing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made." *Id*. at ¶ 14. The moving party has the initial burden of informing the court of the basis for the motion and identifying the portions of the record that set forth specific facts demonstrating entitlement to summary judgment. *Id*. at ¶ 15. If the moving party fails to meet its burden, summary judgment is not appropriate. *Id*.

### Genuine Issues of Material Fact

**{¶22}** In his first assignment of error, Paul argues that the trial court erred in granting summary judgment in favor of Northgate, because there were genuine issues of material fact for trial. Specifically, Paul contends that the trial court misstated the size of his wound and how many months elapsed between hospitalization and amputation.

**{¶23}** But "[a] fact is material if it might affect the outcome of the suit under the applicable substantive law." (Internal quotation marks omitted.) *Cirino v. Bur. of Workers' Comp.*, 2021-Ohio-1382, 171 N.E.3d 840, ¶ 22 (10th Dist.). Neither the size of Paul's wound nor the amount of time that elapsed between hospitalization and amputation affects the outcome of any of his claims. Indeed, there were genuine issues of material fact that existed as to Paul's claims, as will be discussed in detail below.

9

The facts that Paul raises in his first assignment of error, however, are immaterial. Accordingly, we overrule Paul's first assignment of error.

### *Classification of Northgate*

{¶24} Next, Paul argues the trial court erred as a matter of law in concluding Northgate was not a nursing home under R.C. Chapter 3721, but rather a residential facility under R.C. 5119.34 and 5123.19.

{¶25} Northgate's license states that it is a residential care facility. The license further states that it was issued in accordance with R.C. Chapter 3721, which governs nursing homes and residential care facilities, and with Ohio Adm.Code 3701-17, which also governs nursing homes. Additionally, Caldwell testified that Northgate is a residential care facility.

{¶26} R.C. 3721.01(A)(1)(a) provides that a "home" includes nursing homes *and* residential care facilities. R.C. 3721.01(A)(7) defines a "residential care facility" as a facility that provides accommodations for unrelated individuals and supervision and personal care for these individuals who are dependent by reason of age or physical or mental impairment, either with or without skilled nursing care. Thus, a residential care facility can be classified as a home *without* providing skilled nursing care under R.C. 3721.01(A)(7).

{¶27} Despite the fact that its license makes no mention of R.C. 5119.34 and 5123.19, Northgate maintains that it is licensed under these statutory sections and not under R.C. Chapter 3721. R.C. 5119.34 and 5123.19 govern residential facilities for adults with mental illnesses and developmental disabilities respectively. Northgate argues that it is licensed under these statutory sections, because R.C. 3721.01(A)(1)(c) specifies that a "home" does not include residential facilities licensed under R.C.

5119.34 and 5123.19 and because it does not provide skilled nursing care. Neither argument has merit.

{¶28} As we discussed above, R.C. 3721.01(A)(7) explicitly states that a residential care facility, which is how Northgate is classified on its license, does not need to provide skilled nursing care to qualify as a home. Thus, even though Northgate does not provide skilled nursing care, it can still qualify as a home. Further, while R.C. 3721.01(A)(1)(c) does specify that residential facilities under R.C. 5119.34 and 5123.19 do not qualify as a home, Northgate does not explain how this exemption is applicable to it. In its summary judgment motion, Northgate included an affidavit from its current executive director, Elizabeth Dinnesen, in which she averred that it was "clearly stated" on Northgate's license that it was licensed under R.C. 5119.34 and 5123.19. Again, Northgate's license does not reference these statutory sections at all. And aside from this affidavit, Northgate provided no support for its position that it was licensed under R.C. 5119.34 and 5123.19.

{¶29} Therefore, because the evidence before the trial court did not support a finding that Northgate was licensed under R.C. 5119.34 and 5123.19, the trial court erred a matter of law in making this determination. Because it misclassified Northgate, the trial court therefore erred in granting summary judgment to Northgate on Paul's claim under R.C. 3721.13 and 3721.14.[2] Paul's second assignment of error is accordingly sustained.

---

[2] In making this determination, we do not reach the question of whether Northgate is a "home" under the statutory definition set forth in R.C. 3721.01(A)(1)(a).

### *Negligence*

**{¶30}** In Paul's third assignment of error, he argues the trial court erred as a matter of law in finding he failed to identify a source of duty as to his negligence claim. And in his fourth assignment of error, he argues the trial court erred in finding Northgate's breach of the RSA could not constitute a breach of duty under his negligence claim. Because both assignments of error consider the source of duty, we consider them together.

**{¶31}** Under R.C. 3721.13, residents of a home, as defined by R.C. 3721.01(A)(1)(a), are afforded certain rights. And under R.C. 3721.17(G)(1), a resident whose rights are violated has a cause of action against the home committing the violation. If the resident can show, by a preponderance of the evidence, that the violation of his rights resulted from a negligent act or omission of the home and that violation was the proximate cause of the resident's injury, the resident may recover compensatory damages. R.C. 3721.17(G)(2)(a).

**{¶32}** But, while generally a tort claim based upon the same underlying actions cannot coexist with the contract action, such a tort claim is actionable if the breaching party also breached a duty owed independent of the contract. *Evans Landscaping, Inc. v. Stenger*, 2011-Ohio-6033, 969 N.E.2d 1264, ¶ 16 (1st Dist.).

**{¶33}** Here, Paul maintains that, because he was afforded the rights of a resident of a home under R.C. 3721.13, Northgate owed him a duty independent of the RSA. As we held above, the trial court erred in finding Northgate was licensed under R.C. 5119.34 and 5123.19. If on remand the trial court determines Northgate is a "home" under R.C. 3721.01(A)(1)(a), then Paul is entitled to the rights defined under R.C. 3721.13. And if Paul is entitled to those rights, then he did identify a source of

duty for his negligence claim beyond Northgate's alleged breach of the RSA. But Paul may not rely on a breach of the RSA alone as a source of duty. *See id.* at ¶ 16.

**{¶34}** Therefore, we sustain Paul's third assignment of error, because the trial court erred as a matter of law in finding he failed to identify a source of duty as to his negligence claim. But we overrule Paul's fourth assignment of error, because under Ohio law, a breach of contract does not create a tort claim. The trial court's grant of summary judgment as to Paul's negligence and resident's rights claims in favor of Northgate is accordingly reversed.

### *Breach of Contract*

**{¶35}** In Paul's fifth assignment of error, he argues genuine issues of material fact existed as to his breach of contract claim.

**{¶36}** "The elements of a breach of contract claim include: (1) the existence of a contract, (2) performance by the plaintiff, (3) breach by the defendant, and (4) damages resulting from the breach." (Internal quotation marks omitted.) *Ma v. Cincinnati Children's Hosp. Med. Ctr.*, 2023-Ohio-1727, 216 N.E.3d 1, ¶ 15 (1st Dist.). Here, the parties focus on the third element: whether Northgate breached the RSA and accompanying care plan.

**{¶37}** As discussed above, Paul's care plan was modified to include the following: "Requires stand-by *or* hands-on assistance from caregiver (***wash back and feet***) for bath/shower 2-3 times a week[.] Sundays and Thursday[s] 2nd Shift." (Emphasis added.) Northgate contends Paul had only contracted for stand-by bathing assistance and that stand-by bathing assistance was limited to reminding Paul to bathe. Northgate acknowledges its staff did not consistently describe what stand-by bathing assistance meant. Instead, Northgate argues "regardless of which description

[Paul] emphasizes, his own deposition testimony makes clear that the duty was satisfied."

**{¶38}** But the deposition testimony regarding Paul's bathing routine actually creates a genuine issue of material fact. While Watkins testified stand-by bathing assistance was limited to reminding Paul to bathe, Kuntz testified that it included encouraging Paul to bathe and standing nearby to ensure he did not fall. Moreover, Paul himself recalled Northgate staff being nearby when he showered and even washing his back.

**{¶39}** In an attempt to resolve the dispute of fact as to the bathing provision, the trial court discredited Paul's testimony given his memory issues. But later, it relied on Paul's recollection that Northgate staff were nothing but kind and courteous to conclude his IIED claim was without merit. On a motion for summary judgment, it is not the duty of the trial court to weigh the credibility of the witnesses. *See Grubach v. Univ. of Akron*, 10th Dist. Franklin No. 19AP-283, 2020-Ohio-3467, ¶ 40 ("A court cannot weigh credibility when considering evidentiary material presented in favor of, or in opposition to, a summary judgment motion."). "Such functions are for the trier of fact, not for a judge ruling on a motion for summary judgment." *Id.* Thus, at the summary judgment stage, the trial court should not have discredited parts of Paul's testimony as a means of resolving the factual dispute that existed as to the bathing provision.

**{¶40}** Not only were there genuine issues of material fact as to what kind of bathing assistance Paul actually received, but there were also material disputes of fact regarding the level of care Paul needed. The RSA clearly stated that, "Staff will reassess you regularly to determine the level of personal assistance and care that you need." In

fact, this language in the RSA appears to be precisely why Paul's level of care was modified to include bathing assistance. Caldwell testified that because staff smelled an odor outside of Paul's unit, she spoke with Paul and Aaron to modify Paul's care plan to include bathing.

{¶41} Thus, because genuine issues of material fact existed as to the kind of care Paul needed and whether he was receiving the care he contracted for, we sustain Paul's fifth assignment of error and reverse the trial court's grant of summary judgment as to Paul's breach of contract claim in favor of Northgate.

### IIED

{¶42} Lastly, Paul argues the trial court erred in finding his IIED claim failed.

{¶43} "To state a claim for [IIED], the plaintiff must show that the defendant's conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *FAP Properties XL, LLC v. Griffin*, 1st Dist. Hamilton No. C-210646, 2022-Ohio-3410, ¶ 24. Paul spoke highly of Northgate staff, describing them as kind and courteous. He also testified they had a tough job to do and that he held nothing against them. Further, Aaron did not testify to any extreme or outrageous conduct by Northgate staff.

{¶44} As discussed above, Northgate's actions may or may not have amounted to a breach of contract and negligence. But its actions did not rise to the level of extreme and outrageous conduct required to sustain an IIED claim. Paul's sixth assignment of error is therefore overruled and the trial court's grant of summary judgment in favor of Northgate as to his IIED claim is affirmed.

15

*Conclusion*

**{¶45}** We overrule Paul's first assignment of error, because the factual disputes he raised, namely the size of his ulcer and length of time between hospitalization and amputation, were immaterial to resolving his claims. We sustain Paul's second assignment of error, because the trial court erred as a matter of law in finding that Northgate was licensed under R.C. 5119.34 and 5123.19.

**{¶46}** Further, because Paul may be entitled to the rights described under R.C. 3721.13, which would be a source of duty Northgate owed him independent of the RSA, we sustain Paul's third assignment of error. But we overrule Paul's fourth assignment of error, because a breach of the RSA does not create a tort claim under Ohio law.

**{¶47}** We sustain Paul's fifth assignment of error, because genuine issues of material fact existed as to the kind of care Paul needed and actually received. Lastly, we overrule Paul's sixth assignment of error, because Northgate's conduct did not rise to the level of extreme and outrageous conduct required to sustain an IIED claim. We remand the cause for further proceedings consistent with the law and this opinion.

Judgment affirmed in part and reversed in part, and cause remanded.

**ZAYAS, P.J.,** and **WINKLER, J.,** concur.

Please note:
    The court has recorded its own entry on the date of the release of this opinion.